IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

LAURA VALENTINE,          :
                              :
     Plaintiff,        :
                              :
     v.               :     CIVIL ACTION NO.
                              :     2:10-CV-00097-RWS
DEPUTY ANDRA BUSH, in her   :
individual capacity, *et al.*,    :
                              :
     Defendants.      :
                              :

## ORDER

This case comes before the Court on Plaintiff's Motion for Partial Summary Judgment [91], Defendants' Motion for Summary Judgment [103], Plaintiff's Motion to Strike Statement of Material Facts Not in Dispute [112], and Defendants' Motion for Leave to File Sworn Statement of William Narens and Amanda Narens in Further Support of Defendants' Response to Plaintiff's Motion for Summary Judgment [123].  After reviewing the record, the Court enters the following Order.

## Background

This case arises out of a custody dispute concerning a minor child, which dispute ultimately led to the arrest of Plaintiff Laura Valentine for obstruction

and interference with custody.

## I.     The Narens' Divorce and Custody Dispute

William and Chrisalena Narens were formerly married and are the
parents of Iris Narens, a five-year-old girl at the time of these events in May
2008.  Plaintiff is William's mother and the grandmother of Iris.  After William
and Chrisalena separated, Chrisalena moved to Texas with Iris.  (Defs.'
Statement of Material Facts ("SMF"), Dkt. [103-1] ¶ 43.)  Chrisalena then filed
for divorce in Texas in December 2007, and William filed for divorce in
Georgia in February 2008.  (Dkt. [103-3, 103-4].)  Chrisalena hired Paula Free,
an attorney in Georgia, to represent her in obtaining a dismissal of the Georgia
action.

On April 29, 2008, the Superior Court of Barrow County entered an order
finding that Texas had assumed jurisdiction of the divorce action, stating that
the court "declines to further exercise jurisdiction, and relinquishes jurisdiction
to Texas."  (Dkt. [103-5].)  The court then noted that it had conferred with the
court in Texas and, based on agreement by the parties, the court recommended
"that since the child has resided continuously in Georgia for more than eight
months, is enrolled in school in Georgia, (which school year will end in May),

2

the child should finish the school year with her class.  Based on such agreement, the child shall remain in the custody of the Father until further order of the Texas court."  (Id.)  Then, sometime prior to May 22, 2008, Ms. Free was informed by Chrisalena's Texas attorney that the Texas court had issued an order granting Chrisalena custody of Iris.  (See Defs.' SMF, Dkt. [103-1] ¶ 12; Texas Order, Dkt. [103-6].)

## II.    Chrisalena's Attempt to Obtain Custody

On May 22, 2008, Ms. Free sent a letter to William's attorney asking if the parties had agreed on a location to exchange custody of Iris on Monday, May 26, 2008.  Chrisalena and Ms. Free then met with Defendant Deputy Andra Bush of the Barrow County Sheriff's Department on the morning of Monday, May 26.  According to Deputy Bush's incident report, Ms. Free "showed [her] a court order to pick up a 5 year old female from an address at 904 Dogwood Trail[,] Winder, GA."  (Dkt. [96-1] at 1.)  Deputy Bush states that she assumed the order was signed since an attorney, Ms. Free, provided it to her.  (Bush Depo., Dkt. [96] at 38.) Moreover, Ms. Free told Deputy Bush that the order granted custody of Iris to Chrisalena, (Defs.' SMF, Dkt. [103-1] ¶ 27) but Plaintiff disputes the reasonableness of relying on Ms. Free.  In any

3

event, Ms. Free also informed Deputy Bush that there was a history of violence between Chrisalena and William.  (Id.)

Plaintiff further disputes that Deputy Bush saw the Texas custody order on May 26, instead asserting that Deputy Bush only received a copy of the order on June 10, 2008, and thus it is "unclear what order was received when." (Pl.'s Resp. to Defs.' SMF, Dkt. [113-1] ¶ 24.)  Plaintiff relies on Deputy Bush's deposition wherein Deputy Bush stated that Ms. Free showed her a custody order, although she could not remember if it was signed by a judge, and she later received a copy of the order by mail on June 10, 2008.  (Bush Depo., Dkt. [96] at 34-36.)  Plaintiff is unable to point to any facts disputing whether Ms. Free showed Deputy Bush a custody order on May 26, 2008.  Nonetheless, Plaintiff asserts that the order was not facially valid because it was unsigned, bearing only a signature by an "Associate Judge" appearing below the blank signature line for the "Judge Presiding."  (See Custody Order, Dkt. [96-1] at 26.)  It is undisputed, however, that the order was not domesticated pursuant to O.C.G.A. § 19-9-85.  (See Defs.' SMF, Dkt. [103-1] ¶ 22; Pl.'s Resp. to Defs.' SMF, Dkt. [113-1] ¶ 24.)

4

At the time of these events, William and his daughter were residing with Plaintiff at 901 Dogwood Trail, Winder, Georgia.  On Monday, May 26, Deputy Bush went to Plaintiff's home and informed Plaintiff that she had a custody order granting custody of Plaintiff's granddaughter to Chrisalena.  (Id. ¶ 32.)  Deputy Bush asked if William and Iris were at the residence, and Plaintiff responded that William and Iris had gone on vacation to Cade's Cove in the Tennessee Smoky Mountains on Friday but would be back early that week.  (Valentine Depo., Dkt. [60] at 43-44; Incident Report, Dkt. [96-1] at 2.) Plaintiff told Deputy Bush that William did not have a cellular phone but had called from a friend's phone just before going out of range to let Plaintiff know where they were traveling.  (Def.'s SMF, Dkt. [103-1] ¶ 33.)

The next day, Tuesday, May 27, 2008, Deputy Bush drove by Plaintiff's home but did not see William's vehicle.  Deputy Bush then visited Holsenbeck Elementary School, where she was informed that Iris was absent.  When Deputy Bush told Chrisalena that William had not yet returned with Iris, Chrisalena became upset, expressing fear that William had "taken her and [run] again." (Incident Report, Dkt. [96-1] at 2.)  Chrisalena explained that after the separation, Chrisalena and her daughter moved to Texas, and on one of

5

William's visits he took Iris from Texas to Georgia and declared he was not going to return her.  (Id. at 3.)  Chrisalena further explained that William had served in the military for over eight years, and after he "returned from Iraq he began worshiping Satan and even had a satanic name, Neocelt."  (Id.)  Plaintiff, on the other hand, argues that Chrisalena was lying and that Defendants did not attempt to verify her story.  (Pl.'s Resp. to Defs.' SMF, Dkt. [113-1] ¶ 40.)

Chrisalena also reported to Deputy Bush that William used illegal drugs and was involved in a satanic group that conducted animal sacrifice and valued the sacrifice of a child or a child's virginity.  (Incident Report, Dkt. [96-1] at 3.) Chrisalena said she was worried for the safety of her daughter and requested an Amber Alert.  (Id. at 4.)  However, the Georgia Bureau of Investigation declined to issue the alert after determining that the case did not meet the requirements for issuing one.  (Id.)  That same day, Deputy Bush obtained an arrest warrant for William for interference with custody.

### III.   The Search for William Narens and Arrest of Plaintiff Valentine

On Tuesday, May 27, 2008, Deputy Bush returned to Plaintiff's home, spoke to Plaintiff, and informed her that Defendants had a warrant for William's arrest.  (Defs.' SMF, Dkt. [103-1] ¶ 50.)  Plaintiff said she still had

6

not spoken to her son.  (Valentine Depo., Dkt. [60] at 57.)  Plaintiff permitted

Deputy Bush to see inside William's room, where Deputy Bush observed

"several satanic pictures, books, and a schedule for a satanic conference in

Atlanta."  (Incident Report, Dkt. [96-1] at 5.)  Plaintiff insisted that William

was not a Satan worshiper but was instead doing research for a friend, and the

books were by Anne Rice, the gothic fiction writer, and were about Celtic

religions.  (Id.)

Deputy Bush contacted federal authorities at the Great Smoky Mountains

National Park, faxed park rangers photographs of William and Iris, and asked

them to search for William's vehicle around Cade's Cove.  (Defs.' SMF, Dkt.

[103-1] ¶ 60.)  After the park rangers informed Deputy Bush later that day that

they had not seen William or Iris at any of the camp grounds in the area, Deputy

Bush, Defendant Investigator Faye Spaulding, and Defendant Investigator Lisa

Farlow[1] visited Plaintiff's home again.  (Id. ¶¶ 60-61.)

When the officers arrived at Plaintiff's home at approximately 4:30 p.m.,

Plaintiff was about to leave to pick up her ten year-old daughter, McKenzie.

McKenzie has several neurological conditions, including autism spectrum

_____

[1]At the time of these events, Lisa Farlow was known as Lisa Carr.

7

disorder.  (Id. ¶ 68; Valentine Depo., Dkt. [60] at 31-32, 65.)  One of the deputies had learned from either an assistant principal or a school resource officer at McKenzie's school that McKenzie had informed school counselors that Iris was not in the Smoky Mountains but was with someone named Amanda who goes by Mericala.  (Defs.' SMF, Dkt. [103-1] ¶ 69; Incident Report, Dkt. [96-1] at 6.)  Defendants asked where McKenzie was and said that they "would like to speak to her," although Plaintiff did not believe they wanted to speak to McKenzie immediately.  (Valentine Depo., Dkt. [60] at 73:4-16.)  Plaintiff informed them that McKenzie was at the home of Kathryn Bryant, one of Plaintiff's friends.  (Id. at 73-74.)  Plaintiff proceeded to Ms. Bryant's home and told her what was going on.  (Id. at 71.)  Plaintiff said she was concerned for McKenzie because she "was afraid [the deputies] were going to want to speak to [McKenzie] and . . . was afraid of her reaction when she saw all of those officers outside [Plaintiff's] house."  (Id. at 72-73.)  Ms. Bryant offered to let McKenzie continue to stay with her and play with her children, and Plaintiff agreed and returned home.  (Id. at 71.)

Plaintiff and Defendants next dispute whether Plaintiff told Defendants that McKenzie was untruthful.  Investigator Farlow contends that Plaintiff told

8

her that McKenzie "was a pathological liar, that she did not know what she was saying." (Farlow Depo., Dkt. [97] at 22:2-3.) Plaintiff claims, however, that she only expressed her concern for McKenzie and how she would react to the officers. (Valentine Depo. Dkt. [60] at 68.) Whatever Plaintiff said, it is undisputed that Investigator Farlow contacted officials at McKenzie's school, who informed her that McKenzie was capable of interacting with people and was known to be truthful. (Defs.' SMF, Dkt. [103-1] ¶¶ 73-75.)

After speaking to school officials, Investigator Farlow and Deputy Bush went to Ms. Bryant's home to question McKenzie. (Id. ¶ 76.) Deputy Bush spoke to Ms. Bryant, who brought McKenzie outside. (Id. ¶ 77.) Investigator Farlow asked McKenzie about Iris's whereabouts, and she replied, "My mom doesn't want anybody to know." (Id. ¶ 80.) McKenzie also said her parents told her that Chrisalena was a bad mom and "had gone against the law to get Iris." (Id. ¶ 82.) McKenzie explained that Plaintiff did not want Iris to go back to Chrisalena, and Plaintiff told her not to share where Iris was with anyone. (Id. ¶¶ 84-87.) Moreover, McKenzie had recently spoken to Iris because William had called Plaintiff the last two nights. (Id. ¶¶ 89, 91.) Finally, McKenzie acknowledged that she knew about a woman named Amanda who

goes by Mericala, the woman she mentioned to school officials.  (Id. ¶ 83.)

Based on this interview, Investigator Farlow thought McKenzie communicated

well and concluded Plaintiff knew where Iris was but refused to inform the

deputies and further told McKenzie to lie to them.  (Id. ¶ 93.)

Meanwhile, Ms. Bryant called Plaintiff and told her that the officers were

at her house.  Another deputy alerted Deputy Bush that Plaintiff was on her way

to Ms. Bryant's home and was driving extremely fast.  (Id. ¶ 98.)  Plaintiff

arrived on the scene and confronted Defendants, telling them they were not

going to interview her daughter.  (Id. ¶ 99.)  Believing that Plaintiff had

interfered with their investigation and attempt to locate William and Iris,

Defendants placed Plaintiff under arrest for obstruction.  (Id. ¶¶ 104-108.)

Based on the above facts, Plaintiff and her husband, Gary Valentine,

brought this action pursuant to 42 U.S.C. § 1983 for false arrest, conspiracy,

unconstitutional detention and confinement, and supervisory liability against

Sheriff Joel Robinson, Deputy Andra Bush, Deputy Ian Geiman, Investigator

Faye Spaulding, and Investigator Lisa Farlow.  On March 11, 2011, the Court

dismissed all of Mr. Valentine's claims in addition to Plaintiff's supervisory

liability claim against Sheriff Robinson.  (Dkt. [21].)  On May 17, 2012,

10

Plaintiff dismissed her claims against Deputy Geiman.  (Dkt. [51].)  Plaintiff moves for partial summary judgment on her false arrest claim.  Defendants move for summary judgment as to all claims, asserting they had probable cause to arrest Plaintiff for obstruction and for being a party to the crime of interference with custody.

## Discussion

## I.      Preliminary Matters

As a preliminary matter, in Plaintiff's Motion to Strike Statement of Material Facts [112], Plaintiff asserts that Defendants have failed to comply with Local Rule 7.1D by filing a statement of material facts exceeding 25 pages and by incorporating their statement of facts into their brief.  Although Defendants did provide a lengthy fact statement, Plaintiff does not point out which paragraphs are irrelevant to Defendants' Motion for Summary Judgment. Furthermore, Local Rule 7.1D only limits *briefs* to 25 pages, not statements of material fact.  And given the fact-intensive nature of this case, the Court does not find Defendants' filing to be so lengthy as to warrant the extreme sanction of denying Defendants' motion.  Nor is the Court persuaded that it should sanction Defendants for incorporating their statement of facts into their brief.

11

See Vinnett v. Gen. Elec. Co., 271 F. App'x 908, 915 (11th Cir. 2006) (holding that it is not an abuse of discretion to permit a party to "incorporate its statement of undisputed material facts in its supporting brief when the district court's local rules require [movant] to file the statement along with its motion for summary judgment").  Accordingly, Plaintiff's Motion to Strike [112] is **DENIED**.

Defendants have also filed a Motion for Leave to File Sworn Statement of William Narens and Amanda Narens [123].  Defendants seek to file this statement because it provides evidence that (1) Plaintiff knew William and Iris Narens were not camping, (2) Plaintiff in fact attempted to prevent Defendants from speaking to McKenzie, and (3) Plaintiff harassed William throughout this litigation to prevent him from telling the truth.  (Defs.' Br., Dkt. [123-2] at 3-4.) The Court finds that none of these issues is relevant to whether Defendants had arguable probable cause to arrest Plaintiff for obstruction.  As discussed below, the qualified immunity inquiry focuses on facts and circumstances known to Defendants at the time of the arrest.  Nevertheless, even though the Court does not rely on the sworn statement in its analysis, the Court hereby **GRANTS** Defendants' Motion [123] for the purposes of completing the record.

12

## II.      Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome

of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist.  Rather,

14

"[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

**III.    Analysis**

    A.    Qualified Immunity Standard and False Arrest

The doctrine of qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities. Wilson v. Layne, 526 U.S. 603, 609 (1999). Officials are shielded "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003). Once the government official has satisfied this initial burden, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. Id. at 1358.

15

Whether an official is entitled to qualified immunity is determined by a two-step inquiry:  One inquiry is "whether the plaintiff's allegations, if true, establish a constitutional violation."  Barnett v. City of Florence, 409 F. App'x 266, 270 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 736 (2002)).  "If the facts, construed . . . in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was 'clearly established.' "  Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case."  Id. (citing Pearson v. Callahan, 555 U.S. 223, 241 (2009)).

To receive qualified immunity when a plaintiff alleges an arrest in violation of the Fourth Amendment, an arresting officer must show "arguable probable cause to believe that a person is committing a particular public offense."  Redd v. City of Enter., 140 F.3d 1378, 1384 (11th Cir. 1998).  An officer has arguable probable cause "where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' " Plaintiff.  Id. (quoting Von

16

Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990).  Thus, the information

relevant to determining whether Defendants had arguable probable cause is the

information known to Defendants at the time of the arrest and not the facts

"known to the plaintiff then or those known to a court later."  Jones v. Cannon,

174 F.3d 1271, 1283 n.4 (11th Cir. 1999).  Moreover, a finding of probable

cause only requires reasonably trustworthy information.  Ortega v. Christian, 85

F.3d 1521, 1525 (11th Cir. 1996).

  B.  Did Defendants Have Arguable Probable Cause?

  Defendants argue that they had arguable probable cause to arrest Plaintiff

for obstruction.  Under O.C.G.A. § 16-10-24(a), "a person who knowingly and

willfully obstructs or hinders any law enforcement officer in the lawful

discharge of his official duties is guilty of a misdemeanor."  The Georgia Court

of Appeals has held that "violence or forcible resistence is not required to prove

that an officer was hindered or obstructed in a misdemeanor obstruction case.

Argument, flight, stubborn obstinance, and lying are all examples of conduct

that may satisfy the obstruction element."  Pinchon v. State, 516 S.E.2d 537,

538 (Ga. Ct. App. 1999).  Defendants argue that Plaintiff obstructed their

investigation by lying about William and Iris's location and whether she knew

17

how to get in touch with them.  Moreover, as a threshold issue, Defendants assert they were conducting an investigation pursuant to at least three official duties: (1) the duty to enforce court orders, (2) the duty to protect life and maintain order, and (3) the duty to serve arrest warrants.  Plaintiff responds that Defendants exceeded their official authority because Defendants were not justified in relying on the undomesticated Texas custody order, Defendants did not have sufficient evidence to believe that Iris's life was in danger, Defendants should have known it was unreasonable to apply for a warrant for William Narens's arrest, and it is unclear if Defendants obtained William's arrest warrant before Plaintiff's arrest.  (See Pl.'s Br. in Supp. of Mot. for Summ. J., Dkt. [91] at 20; Pl.'s Resp., Dkt. [113] at 5-14.)

The Court first inquires into whether Defendants were engaged in the lawful discharge of their duties at the time of Plaintiff's arrest.  If so, the Court will then assess whether Defendants had arguable probable cause to believe Plaintiff committed misdemeanor obstruction.

### 1.    Lawful Discharge of Their Duties

Although the parties vigorously contest whether Defendants could enforce the Texas custody order, the Court need not determine whether the

order was in fact facially valid or whether Defendants had a duty to enforce it.
Rather, having reviewed the record, the Court finds that Defendants were
exercising their lawful authority pursuant to their official duties "to preserve
public order, to maintain the peace, and to protect lives, persons, property,
health and morals."  Harris v. State, 622 S.E.2d 905, 907 (Ga. Ct. App. 2005);
see also Duncan v. State, 294 S.E.2d 365, 366 (Ga. Ct. App. 1982) (noting that
"all law enforcement officers have the general duty to enforce the law and
maintain the peace").  Accordingly, the Court need not pass on issues related to
whether Plaintiff obstructed Defendants' duty to serve the arrest warrant for
William Narens.

Before Defendants ever visited Plaintiff's home, they were aware that (1)
there was a custody order from Texas awarding custody to Chrisalena; (2) an
attorney, Ms. Free, advised them it was enforceable because Georgia courts had
deferred to the Texas court's jurisdiction; (3) there was a concern about past
violence between William and Chrisalena; and (4) Chrisalena intended to pick
up Iris.  Based on this information, and even assuming the Texas order was not
domesticated and was unenforceable, as Plaintiff argues, the Court cannot say
that no reasonable officer would have visited Plaintiff's home pursuant to a

duty to maintain the peace in resolving a civil dispute—here, the exchange of custody.  See, e.g., Thornton v. City of Macon, 132 F.3d 1395, 1399 (11th Cir. 1998) (holding that while an officer could "mediate and defuse a contentious situation" by assisting in the exchange of belongings between former roommates, the officer could not force a party to make the exchange in an attempt to resolve a civil dispute).

After Defendants learned from Plaintiff that William had taken Iris out of state and could not be reached by phone, Chrisalena told Defendants more information that could raise concerns about Iris's safety.  For example, Chrisalena reported that William had taken Iris before and refused to return her, was involved with individuals who valued taking a child's virginity, and used illegal drugs.  Plaintiff disputes the truth of these assertions, but as stated above, the qualified immunity analysis focuses on what Defendants knew at the time. Plaintiff also contends that it was unreasonable for Defendants to rely on this information without corroborating it.  The Court disagrees.  This information gave Defendants further reason to locate William and Iris.  After all, locating and speaking to William would have been necessary to corroborate Chrisalena's story.  Meanwhile, William did not return home on May 26 or 27, and

Defendants confirmed that Iris was not in school on those days.  Park rangers in the Smoky Mountains were unable to locate William in Cade's Cove, further raising suspicions that he might have fled with Iris.  In view of this information, coupled with assertions from an attorney that Chrisalena had a custody order from Texas, whether enforceable at that point or not, the Court cannot say that no reasonable officer would have believed they had a duty to locate William to ensure Iris's safety.

Still, Plaintiff argues it was unreasonable for Defendants to believe Iris's life was in danger because Defendants' attempt to issue an Amber Alert was unsuccessful.  But Defendants' choices were not constrained to either (1) issuing an Amber Alert or (2) ending the investigation.  Law enforcement officers possess an array of tools to fulfill their duties.  Just because the GBI concluded that an Amber Alert was not warranted did not mean that all inquiry had to end.  Faced with troubling information about William, a possible custody order granting custody to Chrisalena, and an inability to locate a five-year-old girl who at that point had been absent from school for three days, Defendants reasonably decided to continue to question Plaintiff about William and Iris's whereabouts.

21

Plaintiff further argues that Defendants are like the defendants in
Thornton v. City of Macon because Defendants could not force William to
exchange custody even if their presence was justified to defuse a civil dispute.
(Pl.'s Resp., Dkt. [113] at 4.)  In Thornton, a woman asked officers to assist her
in exchanging possessions with her former roommate.  When the plaintiff
refused to make the exchange, the officers entered his private residence and
arrested him for obstruction of justice.  Because "the plaintiff had committed no
crime" and the officers had no warrant to enter the residence, the court held that
the officers were "merely attempting forcibly to resolve a civil dispute" and
thus acted outside of their duty to maintain the peace when they arrested the
plaintiff.  Thornton, 132 F.3d at 1399.  Here, by contrast, Defendants first
peaceably asked where William was but only continued their investigation after
Chrisalena expressed her concern that William had fled and that Iris's safety
might be at issue.  In sum, Defendants did not proceed to resolve a civil dispute
by force but instead proceeded with an investigation pursuant to their duty "to
preserve public order, to maintain the peace, and to protect lives, persons,
property, health and morals."  Harris, 622 S.E.2d at 907.

AO 72A
(Rev.8/82)

2.      *Obstruction*

Having found that Defendants were acting pursuant to their duty to preserve the peace and protect life, the Court turns to whether Plaintiff obstructed Defendants in the execution of that duty.  Plaintiff did not use physical obstruction or violence to prevent Defendants from finding William and Iris.  But lying can also constitute misdemeanor obstruction, Pinchon, 516 S.E.2d at 538, and here there is ample uncontradicted evidence that gave Defendants reason to believe Plaintiff knew where William and Iris were, yet lied.

Notably, an assistant principal or a school resource officer who informed Defendants about McKenzie's statement at school that Iris was not in the Smoky Mountains but with a woman named Mericala was highly suspicious given that William could not be found in the mountains where Plaintiff said he was.  Further, when Defendants ultimately questioned McKenzie, she stated that Plaintiff did not want anyone to know Iris's whereabouts and did not want Chrisalena to have custody of Iris.  In addition, Defendants learned that Plaintiff had spoken to William on the phone at least twice in the past two days, contradicting her statements that she could not get in touch with William.

23

The Court notes that Plaintiff contests the truth of much of what McKenzie told Defendants.  But as with many of the disputes in this case, the underlying truth of the statements is insignificant.  Instead, the arguable probable cause inquiry focuses on the circumstances and information known to Defendants at the time of the arrest.  Based on the circumstances leading up to Defendants' conversation with McKenzie, her statements established—at the very least—arguable probable cause to arrest Plaintiff for misdemeanor obstruction.[2]

In sum, because Defendants were acting pursuant to their general duty to protect life and maintain the peace, Defendants had arguable probable cause to arrest Plaintiff when they reasonably believed that Plaintiff lied to them about her son and granddaughter's whereabouts.  Consequently, Defendants are entitled to qualified immunity on Plaintiff's false arrest claim.

---

[2] As the Court finds that Defendants had arguable probable cause to arrest Plaintiff for obstruction, the Court need not address Defendants' alternative argument that they had probable cause to arrest Plaintiff for being a party to the crime of interference with custody.  See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (holding that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

24

C.      Remaining Claims

Plaintiff appears to allege a claim related to the conditions of her confinement in the back of Deputy Bush's police car as "so incredibly oppressive as to shock the conscience." (Am. Compl., Dkt. [22] ¶ 30.) On the other hand, in briefing Defendants' Motion for Summary Judgment, Plaintiff clarifies that she "did not allege a Fourteenth Amendment claim"; rather, these assertions relate to damages. (Pl.'s Resp., Dkt. [113] at 17.) The sole remaining claim, therefore, is Plaintiff's claim that Defendants conspired to violate Plaintiff's constitutional rights by arresting her pursuant to an unenforceable custody order. (See Am. Compl., Dkt. [22] ¶¶ 32-34.) Without any underlying constitutional violation, however, Defendants are likewise entitled to summary judgment on Plaintiff's conspiracy claim. Accordingly, Plaintiff's Motion for Partial Summary Judgment [91] is **DENIED** and Defendants' Motion for Summary Judgment [103] is **GRANTED**.

**Conclusion**

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment [91] is **DENIED**, Defendants' Motion for Summary Judgment [103] is **GRANTED**, Plaintiff's Motion to Strike Statement of Material Facts Not in

AO 72A
(Rev.8/82)

Dispute [112] is **DENIED**, and Defendants' Motion for Leave to File Sworn

Statement of William Narens and Amanda Narens in Further Support of

Defendants' Response to Plaintiff's Motion for Summary Judgment [123] is

**GRANTED**.  The Clerk is directed to enter judgment in favor of Defendants

and against Plaintiff.

      **SO ORDERED**, this __18th__ day of July, 2014.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)